JS 44 (Rev. 09/11)

# CIVIL COVER SHEET

The JS 44 civil coversheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**
Fidelity and Deposit Company of Maryland

**DEFENDANTS**
FIRST NATIONAL COMMUNITY BANCORP., FIRST NATIONAL COMMUNITY BANK, LOUIS A DENAPLES, MICHAEL J. CESTONE, JR., JOSEPH COCCIA, DOMINICK L. DENAPLES, JOSEPH J. GENTILE, WILLIAM P. CONABOY, JOHN P. MOSES, MICHAEL CONAHAN AND DAVID J. LOMBARDI

**(b)** County of Residence of First Listed Plaintiff   Cook County, IL
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Hangley Aronchick Segal Pudin & Schiller
One Logan Square, 27th Floor, Philadelphia, PA 19103-6933
215-568-6200

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government
    Plaintiff

☐ 2 U.S. Government
    Defendant

☐ 3 Federal Question
    *(U.S. Government Not a Party)*

☒ 4 Diversity
    *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Mgmt. Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Med. Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence | | | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus - Alien Detainee (Prisoner Petition) | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district *(specify)*
☐ 6 Multidistrict Litigation

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 1332
Brief description of cause:
rescission; declaratory judgment

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY**
*(See instructions)*
JUDGE
DOCKET NUMBER

DATE
September 5, 2012

SIGNATURE OF ATTORNEY OF RECORD
/s/ Ronald P. Schiller

**FOR OFFICE USE ONLY**

RECEIPT #        AMOUNT        APPLYING IFP        JUDGE        MAG. JUDGE

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FIDELITY AND DEPOSIT COMPANY OF MARYLAND, | : |
| | : |
| Plaintiff, | : **Civ. A. No.** |
| | : |
| v. | : |
| | : |
| FIRST NATIONAL COMMUNITY | : **COMPLAINT** |
| BANCORP., FIRST NATIONAL | : |
| COMMUNITY BANK, LOUIS A | : **Electronically Filed** |
| DENAPLES, MICHAEL J. CESTONE, JR., | : |
| JOSEPH COCCIA, DOMINICK L. | : |
| DENAPLES, JOSEPH J. GENTILE, | : |
| WILLIAM P. CONABOY, JOHN P. MOSES, | : |
| MICHAEL CONAHAN, AND DAVID J. | : |
| LOMBARDI, | : |
| | : |
| Defendants. | : |

Plaintiff Fidelity and Deposit Company of Maryland ("F&D") brings this Complaint against Defendants First National Community Bancorp. ("FNCB"), First National Community Bank ("the Bank"), and current and former directors and officers of FNCB as named individually below ("individual Defendants") for rescission of an insurance policy under which Defendants seek coverage, and in the alternative, for declaratory judgment that the Policy does not cover the claim made by Defendants.

## INTRODUCTION

1.　　This rescission action concerns a dispute over the validity and scope of coverage of Directors & Officer's SelectPlus Insurance Policy No. DOP 000 2802-03 / DEP 0000514-00 ("Policy"). (A true and correct copy of the Policy is attached as Exhibit A.) Defendants demand that F&D pay $10 million—the full limit of liability of the Policy—for the global settlement of

two actions: a shareholder derivative action pending in the Court of Common Pleas for

Lackawanna County, Pennsylvania, *Gray v. Denaples, et al* ("Gray Litigation"), and an un-filed

but threatened class action securities litigation. The two actions arise from the same facts

involving the Bank's departure from its historical loan-risk profile and core competency of

lending in northeastern Pennsylvania, issuing self-dealing loans to directors and officers on

preferential terms, and concealing these errors by issuing materially false and misleading

financial statements which ultimately were restated.

2.    F&D's decision to issue the Policy was based on representations made by

Defendants and their representatives in the application for coverage. F&D has learned that the

application contained several material misrepresentations and omissions. F&D therefore seeks

rescission of both the Policy and the financial institution bond that Defendants obtained using the

same application. In the alternative, F&D seeks a judicial declaration that Defendants' claim

under the Policy does not fall within the scope of coverage afforded by the Policy. The Gray

Litigation and threatened securities action's claims of improper self-dealing and financial

misreporting constitute non-fortuitous losses that the Insured were aware or should have been

aware would likely occur, involve in whole or in part disgorgement of ill-gotten gains, and are

the product of intentional misconduct, all of which mean the losses are not covered under the

Policy.

### THE PARTIES

3.    Plaintiff Fidelity and Deposit Company of Maryland ("F&D") is a Maryland

corporation with its principal place of business in Illinois. F&D is authorized to transact

business and has transacted business in Pennsylvania.

4.     Defendant First National Community Bancorp. ("FNCB") is a corporation organized under the laws of the Commonwealth of Pennsylvania with its principal place of business in Pennsylvania.  It is the holding company of First National Community Bank.

5.     Defendant First National Community Bank ("the Bank") is a National Bank chartered under the National Bank Act.  The Bank is located in Pennsylvania with a designated home office in Dunmore, Pennsylvania.  It is a wholly-owned subsidiary of FNCB.

6.     Defendant Louis A DeNaples was a director of FNCB and the Bank at all times relevant to this Complaint until his resignation on May 12, 2012.  He is a domiciliary and citizen of the Commonwealth of Pennsylvania.

7.     Defendant Michael J. Cestone, Jr. was a director of FNCB and the Bank at all times relevant to this Complaint until his resignation on June 24, 2009.  He is a domiciliary and citizen of the Commonwealth of Pennsylvania.

8.     Defendant Joseph Coccia was a director of FNCB and the Bank at all times relevant to this Complaint.  He is a domiciliary and citizen of the Commonwealth of Pennsylvania.

9.     Defendant Dominick L. DeNaples was a director of FNCB and the Bank at all times relevant to this Complaint.  He is a domiciliary and citizen of the Commonwealth of Pennsylvania.

10.     Defendant Joseph J. Gentile was a director of FNCB and the Bank at all times relevant to this Complaint.  He is a domiciliary and citizen of the Commonwealth of Pennsylvania.

11.     Defendant William P. Conaboy was a director of FNCB and the Bank at all times relevant to this Complaint until his resignation on November 10, 2010.  He is a domiciliary and citizen of the Commonwealth of Pennsylvania.

12.     Defendant John P. Moses was a director of FNCB and the Bank at all times relevant to this Complaint.  He is a domiciliary and citizen of the Commonwealth of Pennsylvania.

13.     Defendant Michael Conahan was a director of FNCB at all times relevant to this Complaint until his resignation on January 26, 2009.  On information and belief, although he is currently serving a sentence of imprisonment in Florida having pleaded guilty to racketeering, he is a domiciliary and citizen of the Commonwealth of Pennsylvania.

14.     Defendant David J. Lombardi was a director of FNCB and the Bank at all times relevant to this Complaint until his resignation on March 1, 2010.  He is a domiciliary and citizen of the Commonwealth of Pennsylvania.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the suit is between citizens of different states and the amount in controversy exceeds the sum or value of $75,000.00 exclusive of interest and costs.

16.     Venue is proper in the Middle District of Pennsylvania under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this district.

## FACTUAL BACKGROUND

A.     **The Insurance Policy and Bond**

17.     Since 2003, Defendants had been insured under F&D's Financial Institution Select Bond and the accompanying Directors and Officers SelectPlus Insurance Policy.  In early 2010, FNCB sought renewal of these coverages.

18.     Prior to April 2010, FNCB hired a broker, Northeast Insurance & Financial Consultants, and an outside consultant to assist in renewing and negotiating coverage for the period July 1, 2010 through July 1, 2011.

19.     On May 21, 2010, a Vice President of FNCB signed a renewal application for FNCB and its directors and officers.  (A true and correct copy of the Application is attached as Exhibit B.)

20.     Throughout the period following submission of the Application, Northeast Insurance & Financial Consultants negotiated with the F&D underwriter for the account, Bernadette Sherrod.  In these negotiations FNCB negotiated to obtain higher limits and additional coverage enhancements.

21.     In reliance on the information provided to it by FNCB, on September 30, 2010, F&D issued the Insured the Directors & Officer's SelectPlus Insurance Policy No. DOP 000 2802-03 / DEP 0000514-00 for the Policy Period July 1, 2010 through July 1, 2011 (the "Policy"), as well as the Financial Institution Select Bond No. FIB 0006168-02 for the Bond Period from July 1, 2010 through July 1, 2011 (the "Bond").  (A true and correct copy of the Policy is attached as Exhibit D.)

22.     The Policy provided for an optional extended reporting period for claims made within one year of cancellation or nonrenewal for wrongful acts occurring before July 1, 2011.

23.     After F&D notified FNCB that it would not renew the Policy on April 19, 2011, FNCB purchased the extended reporting period on June 23, 2011.

24.     F&D seeks to rescind the Policy and the Bond, or in the alternative, obtain a declaration from this Court concerning its obligations to Defendants under the Policy.

**B.** **The Underlying Claims**

### The Gray Litigation

25.     On May 24, 2012, FNCB shareholder Lori Gray filed a complaint in the Lackawanna County Court of Common Pleas against certain current and former directors of FNCB (and nominally FNCB), as well as their former auditor, Demetrius & Company LLC, seeking damages and disgorgement of the profit and benefits obtained by the individual Defendants (the "Gray Litigation"). (A true and correct copy of the Gray Litigation Complaint is attached as Exhibit C.)

26.     The individual Defendants in the Gray Litigation are the same as the individual Defendants in this action.

27.     The Bank is a regional lender which historically had focused its lending practices on serving commercial and retail borrowers in Lackawanna and Luzerne counties. As of December 31, 2001, its loan portfolio was fairly evenly distributed among hotels, auto dealers, gas stations, retail complexes, office complexes, and residential subdivisions.

28.     In support of the claims, the Complaint makes the following allegations against the Bank:

  a.  By December 31, 2007, the Bank's risk profile had dramatically changed, and the Bank apparently had abandoned the sectors upon which its business had been built to venture into new markets with which it had little or no experience, and had begun to make loans to fund the business enterprises of its own board members without the thorough, objective underwriting required for such loans.

  b.  The individual Defendants departed from FNCB's core business competency without adequate internal controls over financial reporting, engaged in

inadequately-reviewed self-dealing, and attempted to cover-up their wrongdoing by issuing false and misleading financial statements. (Ex. C. ¶ 1.)

c. The Board lent money to its own members under relaxed standards and a material portion of those loans are now in default or otherwise distressed. (Ex. C. ¶¶ 3, 33-35, 36-41.)

d. The Bank expanded its lending beyond northeastern Pennsylvania, outside its core competency, and wholly shifted focus to land subdivision, without informing shareholders. (Ex. C. ¶¶ 1, 31.)

e. The Board issued financial statements for fiscal year 2009 and the first two quarters of 2010 that failed to accurately reserve for loan and lease losses, failed to disclose the extent of related party loans and the troubled nature of a material amount of those loans and failed accurately to convey the true state of the Bank's exposure to loans outside of its geographic area. (Ex. C. ¶¶ 4, 36-37, 45-67.)

f. The financial statements concerning fiscal year 2009 and the first two quarters of 2010 underreported the Bank's net losses because it did not "properly account for its [Allowance for Loan and Lease Losses ("ALLL")], the provision for off-balance sheet commitments, [other-than-temporary impairment ("OTTI")] of the Company's securities portfolio, deferred loan fees and costs, goodwill impairment charge and the accounting for the deferred tax asset." (Ex. C. ¶ 57.)[1]

---

[1] The allowance for loan and lease losses is a reduction of the bank's operating income to establish a reserve for bad loans. It is an estimate of uncollectible amounts used to reduce the book value of loans and leases to the amount a bank can expect to collect. Relatedly, an other-than-temporary impairment is a charge taken on a security whose fair value has fallen below the book value and is not expected to recover.

g. Two principals resigned shortly before they would have been required to certify the material accuracy of the 2009 financial statements. (Ex. C. ¶¶ 64, 65.)

h. The Individual Defendants and Demetrius were aware of the suspicious circumstances surrounding the certification of FNCB's financial statements as materially accurate and its internal controls as adequate. (Ex. C. ¶ 67.)

i. On September 8, 2010, FNCB revealed that it had entered a consent order on September 1, 2010 with the Office of the Comptroller of the Currency ("OCC"), the Bank's primary regulator, that restricted the Bank's activities in numerous ways. (Ex. C. ¶ 5.)

j. Prior to September 8, 2010, shareholders had not been made aware of an ongoing OCC investigation into the Bank beginning in 2009 in which the OCC found the Bank's condition and policies and procedures deficient. (Ex. C. ¶ 51.)

k. On October 28, 2010, the Board issued an SEC notice that it would be restating financial statements for fiscal year 2009 and the first two quarters of 2010 (which it did not do until December 2, 2011). (Ex. C. ¶ 53.)

l. Directors were aware of the impropriety of the self-dealing loans and deliberately reported misleading financial information. (Ex. C. ¶¶ 41-45.)

29.     The Gray Litigation Complaint brings four counts against the FNCB directors and officers: Count I (breach of fiduciary duty); Count II (abuse of control); Count III (corporate waste); and Count IV (unjust enrichment). The Complaint also brings four related claims against FNCB's auditor, Demetrius and Company.

30.     Count IV of the Gray Litigation Complaint contends that the Insured unjustly enriched themselves and seeking restitution and disgorgement of all profits, benefits, and other improper benefits obtained by Defendants.  (Ex. C. ¶¶ 80-83.)

### Threatened Securities Class Action

31.     The Memorandum of Understanding drafted as part of the proposed global settlement of the Gray Litigation and the threatened securities action characterizes the threatened securities class action as being substantially similar to the Gray Litigation, and adding claims based upon, *inter alia,* alleged violations of § 10(b) and 14(a) of the Securities Exchange Act of 1934.

32.     The likely basis of the § 14(a) claim concerns FNCB's April 14, 2010 proxy statement that failed to properly identify the total amount of the loans provided to particular directors who were being nominated for re-election to the Board, as well as the impairment that had been incurred on some of these loans.

33.     Alternatively, the securities action may contend that the proxy statement's failure to disclose information known to FNCB about the deficiency of FNCB's auditor, Demetrius and Company, based on the regulatory criticisms FNCB had received since 2009.

34.     The likely basis for the § 10(b) claim is that the SEC and OCC's repeated concerns over FNCB's accounting methods beginning in 2009 put the Company on notice of the erroneous financial statements.

C.   **The Coverage Dispute**

35.     On May 30, 2012, F&D received a notice of claim concerning the Gray Litigation.

36.     On June 28, 2012, F&D sent Defendants a letter reserving its rights under the Policy.

37.     On August 8 and 13, 2012, respectively, the individual Defendants in the Gray Litigation and FNCB demanded that F&D pay $10,000,000 for a settlement that would settle both the Gray Litigation and the threatened securities class action.

### Self-dealing loans and the prosecution of former director Michael Conahan

38.     With respect to the claims of improper lending practices and self-dealing, the Insureds were aware of the fact of the loans, the standards followed in their issuance and how they were serviced, and the status of the loans at the time of the financial reporting.

39.     Each Defendant was also aware of at least one particular self-dealing loan outside the scope of the Bank's geographic competency: the loan given to Michael T. Conahan to purchase a Florida property because this loan and Conahan's accounts at the Bank were the subject of a federal subpoena served upon FNCB prior to May 2010.

40.     The crimes for which Conahan was indicted included using the Bank to engage in money laundering, including using the Bank-financed condominium property in Florida to launder the kick-backs Conahan received for the various abuses of his office as judge of the Court of Common Please related to juvenile detention.  Conahan ultimately pleaded guilty to racketeering conspiracy.

41.     Because of the federal subpoena of bank records, the fact that Conahan was a director of the Bank, and the bank's high degree of involvement in the money laundering

- 10 -

allegations, Defendants were each aware prior to May 2010 that the bank had made a loan to purchase a property for one of the Bank's own directors, outside the Bank's core geographic competency, and that was likely to become a loss for the Bank because of the property's link to an illegal money laundering scheme.

42. The Insured concealed the foregoing information from F&D prior to the issuance of the Policy and Bond.

### SEC investigation

43. FNCB had ongoing contact with the SEC from at least September 2009 to present concerning the ALLL and OTTI accounting issues that are the subject of the Gray Litigation and the threatened securities complaint.

44. On September 25, 2009, the SEC sent a comment letter to FNCB seeking additional information about FNCB's financial reporting and suggesting the need to further revise the company's financial statements in a number of areas.

45. The correspondence between FNCB and the SEC addressed FNCB's admission that it had not properly calculated the ALLL, the same problem that was eventually revealed in the December 2, 2011 restatements upon which the Gray Litigation and threatened securities suit are premised.

46. The correspondence also addressed the other key accounting issue, the OTTI calculations, with the SEC questioning FNCB's determination of the amount of reported credit-related OTTI.

47. On January 8, 2010, the SEC wrote another comment letter to FNCB. In this follow-up letter, the SEC again flagged the issue of the ALLL calculations as potentially

requiring disclosure to shareholders of a material weakness in FNCB's internal controls over financial reporting, and also again flagged the OTTI issue.

48.     On June 8, 2010, the SEC wrote a third comment letter to FNCB regarding the ALLL and OTTI calculations.

49.     The Insured was aware of the serious concerns expressed by FNCB's regulators leading up to the certification of FNCB's financial statements.

50.     The Insured concealed the foregoing information from F&D prior to the issuance of the Policy and Bond.

### OCC investigation

51.     Unbeknownst to F&D (and according to the subsequent lawsuit, unbeknownst to FNCB's shareholders), FNCB had been in regular contact with OCC regarding concerns raised by OCC over FNCB's accounting methodology and financial controls since 2008.

52.     FNCB became aware of OCC's active monitoring of FNCB's activities on or before March 31, 2009 after the OCC completed an onsite examination at the Company's offices.

53.     OCC developed a formal Cease and Desist Order which the Company was presented with on or about June 29, 2010 and negotiations on the content of the Consent Order continued until the Consent Order was executed on September 1, 2010.

54.     Thus, FNCB was under active OCC review prior to the insurance application and was actively negotiating a consent order to the OCC during the period in which it was negotiating with F&D for insurance coverage prior to issuance, without informing F&D.

55.     The Insured concealed the foregoing information from F&D prior to the issuance of the Policy and Bond.

**D.**     <u>The Application</u>

56.     The Insured submitted a common application for Zurich's Financial Institution Select Bond and the accompanying Directors and Officers Insurance Policy ("Application") on May 21, 2010.

57.     The Application was incomplete, inaccurate and misleading on many grounds, some now known to F&D because they just recently came to light, and others still concealed by FNCB but to be the subject of discovery. As to some of the grounds now known:

    a.     Question 5 of Section One, Part A of the Application asked for the "Date of last regulatory examination," the "Name of regulator," and "Has there been compliance with all recommendations and criticisms from the last exam?" and "If no, provide full details." The Application states that the regulator is "Office of the Comptroller of the Currency," that the last examination was "4/13/09" and the "No" box is checked. No further details were provided. (Ex. B at 1.) However, in March 2009 and continuing through September 30, 2010 the Insured were on notice that FNCB's accounting methodologies did not comply with the OCC's interpretations of the applicable rules and regulations.

    b.     Question 6 of Section One, Part A of the Application (General Information) asked:

> Has any applicant, as defined in A1 above, received a cease and desist order or entered into any special situation agreement or memorandum of understanding or similar written agreement with, or been the subject of any other administrative, supervisory or compliance sanction, fine, penalty, action or order, by any regulatory agency in the last 3 years, or, if this is a renewal of the bond or policy, since the date of the last application or proposal form?

The "No" box was checked and never updated. (Ex. B at 1.)
*Applicant* is defined in A1 as "the Company, subsidiaries and
directors and officers . . . ." (Ex. B at 1.) The OCC presented the
Bank with a formal cease and desist order on June 29, 2010 and the
OCC entered a consent order with the Bank on September 1, 2010.

c. Question 7 of Section One, Part A of the Application asked, "Has any applicant,
as defined in A1 above, been examined or investigated by the SEC or NASD or
are any examinations or investigations proposed?" The "No" box was checked
and never updated. (Ex. B at 1.) As set forth above, the SEC was repeatedly
involved in questioning FNCB's accounting methodologies.

d. Question 8 of Section One, Part A of the Application asked:

> Has there been any change in the board of directors or
> senior management of the Company or subsidiaries, as
> defined in A1 above (other than death or retirement) in the
> last 3 years, or, if this is a renewal of the bond or policy,
> since the date of the last application or proposal form?

If yes, provide full details. The "Yes" box was checked, and the
Application states, "Resignation of President/CEO in March 2010.
Resignation of CEO in March 2010 to accept another opportunity."
(Ex. B at 1.)

  i. The application did not disclose the resignation of Michael Conahan, who
  was a director of FNCB and resigned as a result of a federal indictment on
  January 26, 2009.

  ii. The application did not disclose the resignation of Michael J. Cestone, Jr.,
  who was a director of FNCB and resigned on June 24, 2009.

- 14 -

iii. The application did not disclose the resignation of William Lance, the principal financial officer and principal accounting officer for FNCB, effective February 2010.

iv. The application omitted key information about each resignation, including but not limited to the fact that both Lance and Lombardi's resignations occurred just days before both were obligated to certify the accuracy of the company's financial statements and the adequacy of its financial controls.

v. The reason for Lombardi's resignation stated in the application contradicts FNCB's SEC filing of March 1, 2010 stating that a replacement was appointed "following the unexpected resignation of J. David Lombardi, who has stepped down as CEO and Director of the Corporation and the Bank for personal health reasons, effective today."

e. Question 9 of Section One, Part A of the Application required the Applicant to provide by attachment the "Most recent annual report (or audited financial statements with all notes and schedules if no annual report is prepared)." A copy of FNCB's 2009 Form 10-K was submitted. (Ex. B at 2.) FNCB's 2009 Form 10-K incorrectly accounted for FNCB's loan and securities losses and impairments, hiding the entity's true financial condition.

f. Question 2 of Section One, Part B of the Application (for the Financial Institution Select Bond) asked, "Does the applicant have any knowledge of acts, omissions, facts, circumstances or situations which might give rise to or afford grounds for any claim or loss that would be covered by the proposed bond (including optional coverages for which a quote is desired)?" The "No" box was checked and never

- 15 -

updated. (Ex. B at 2.) However, the Insured were aware of such facts, circumstances or situations.

58. On information and belief, further discovery is likely to reveal that the Insured gave false or misleading answers to the following questions:

   a. Question 7 of Section One, Part C of the Application (for the D&O SelectPlus Insurance Policy) asked, "Is there any material litigation threatened or pending against any applicant or any person in his or her capacity as a director, officer, employee or spouse or domestic partner of a director or officer of any applicant?" The "No" box was checked and never updated. (Ex. B at 3.)

   b. Question 8b of Section One, Part C of the Application asked, "Has any applicant been a party to any of the following: Any civil, criminal or administrative proceeding alleging or investigating a violation of any security law or regulation?" The "No" box was checked and never updated. (Ex. B at 3.)

59. The Application states:

   The undersigned President or Chairman of the Board of Directors declares that to the best of his/her knowledge the statements set forth herein and any documents and information submitted in connection herewith are true, accurate and complete and that every effort has been made to obtain sufficient information from each and every entity and director and officer proposed for this insurance to facilitate the proper completion of this Application.

(Ex. B at 4.)

60. The Application states:

   The undersigned further agrees that if the information supplied on or in connection with this Application changes between the date of this Application and the effective date of this Insurance, the undersigned will immediately notify the insurer and the insurer may withdraw or modify any outstanding quotations or authorization or agreement to bind insurance.

- 16 -

(Ex. B at 5.)

61.     The Application states:

> The signing of this Application does not bind the undersigned to
> purchase the insurance.  However, it is agreed that this Application
> (and any previously executed proposal forms or applications) and
> any documents or Information submitted herewith shall be the
> basis of the contract should a policy be issued and are to be
> considered as incorporated in and constituting part of the policy.

(Ex. B at 5.)

### E.  Policy Terms and Conditions

62.     The "INSURING CLAUSES" of the Policy's coverage sections provide as

follows:

> The Insurer will pay on behalf of the *Insured Persons* all *loss*
> resulting from any *director and officer claim* first made against the
> *Insured Persons* during the *policy period* or the *extended reporting
> period*, if applicable, for a *director and officer wrongful act*, except
> loss which the *Company* has paid as indemnification.

> The Insurer will pay on behalf of the *Company* all loss resulting
> from any *director and officer claims* first made against the *Insured
> Persons* during the *policy period* or the *extended reporting period*,
> if applicable, for a *director and officer wrongful act* which the
> *Company* has, to the extent permitted by law, paid as
> indemnification.

> . . .

> The Insurer will pay on behalf of the *Insured* all *loss* resulting from
> any *entity claim* first made against the *Insured* during the *policy
> period* or the *extended reporting period*, if applicable, for an entity
> wrongful act.

> . . .

> The Insurer will pay on behalf of the Insured all *loss* resulting from
> any *securities claim* first made against the *Insured* during *the
> policy period* or the *extended reporting period*, if applicable, for a
> *securities wrongful act*.

- 17 -

(Ex. A at Coverage Section 1 Part I(A)-(B); Coverage Section 3 Part I; Coverage

Section 6 Part I.)

      63.     The type of action constituting a claim under each coverage section includes "a

civil proceeding commenced by the service of a complaint or similar pleading . . . in which

money damages are sought, against the *Insured Person* for [the covered wrongful act], including

any appeal thereof." (Ex. A at Coverage Section 1 Part III(C); Coverage Section 3 Part II(D);

Coverage Section 6 Part III(L).)

      64.     Coverage Section 1 provides:

> *Director and officer wrongful act* means any actual or alleged act,
> error, neglect, omission, misstatement, misleading statement or
> breach of duty which shall have been committed or attempted, or
> which shall be alleged to have been committed or attempted by an
> *Insured Person* in his or her capacity as such or, subject to Section
> II (A) of this COVERAGE SECTION, in his or her capacity as a
> director, officer, member, manager, trustee, regent or governor of a
> not-for-profit corporation, or any matter claimed against an Insured
> Person solely by reason of his or her status as an Insured Person of
> the Company.

(Ex. A at Coverage Section 1 Part III(D).)

      65.     Coverage Section 1 defines *Insured Person* as:

> any past, present or future: (1) duly elected director or duly elected
> or appointed officer; (2) duly elected trustee; (3) duly elected or
> appointed advisory or honorary director; (4) duly elected or
> appointed member of any advisory board or committee, or (5) with
> respect to a *Company* that is a limited liability company, duly
> elected, appointed or selected manager, member of the Board of
> Managers or equivalent executive, of the *Company*.

(Ex. A at Coverage Section 1 Part III(G).)

      66.     Coverage Section 3 provides: "*Entity wrongful act* means any actual or alleged

act, error, neglect, omission, misstatement, misleading statement or breach of duty which shall

have been committed or attempted, or which shall be alleged to have been committed or

attempted by *the Insured* in his or her capacity as such." (Ex. A at Coverage Section 3 Part II(E).)

  67. Coverage Section 3 defines *the Insured* as:

> (1) the *Company*; and

> (2) any past, present or future natural person employee of *the Company*, other than a *director or officer*, who the *Company* directly compensates by salary, wages or commissions and who the *Company* directs and controls while the employee performs his or her duties as such; provided, however, that *Insured* shall not include any independent contractor of the *Company*.

(Ex. A at Coverage Section 3 Part II(G).)

  68. Coverage Section 6 provides:

> *Securities wrongful act* means any actual or alleged act, error, neglect, omission, misstatement, misleading statement or breach of duty which shall have been committed or attempted, or which shall be alleged to have been committed or attempted by an *Insured Person* acting in their capacity as such or by the *Company* relating to the purchase or sale of, or offer to purchase or sell, securities issued by the *Company*.

(Ex. A at Coverage Section 6 Part III(M).)

  69. Coverage Section 6 defines *Insured Person* as it is defined in Coverage Section 1.

(Ex. A at Coverage Section 6 Part III(F).)

  70. Under each of the above coverage sections, the definition of *loss* excludes "matters which are uninsurable under the law pursuant to which this policy shall be construed." (Ex. A at Coverage Section 1 Part III(H)(3); Coverage Section 3 Part II(H)(3); Coverage Section 6 Part II(G)(3).)

  71. Each of the above coverage sections contains an exclusion for loss "based upon or attributable to or arising from the gaining in fact by such Insured Person of any profit, remuneration or advantage to which such Insured Person was not legally entitled." (Ex. A at

- 19 -

Coverage Section 1 Part IV(A)(3); Coverage Section 3 Part III(C); Coverage Section 6 Part IV(C).)

72.     Each of the above coverage sections excludes loss "based upon or attributable to or arising from any intentional misconduct or dishonest, fraudulent or criminal act or omission or any willful violation of any common or statutory law or regulation by such Insured Person" whenever "a binding adjudication in such director and officer claim or any other proceeding adverse to such Insured Person shall establish such intentional misconduct, dishonest, fraudulent or criminal act or omission or willful violation." (Ex. A at Coverage Section 1 Part IV(A)(8); Coverage Section 3 Part III(H); Coverage Section 6 Part IV(H).)

73.     Part VII(F) of the Common Policy Terms ("Representations and Severability") provides:

> The *Insured* represents that the particulars and statements contained in the Application and any documents or information submitted to the Insurer in connection therewith are true, accurate and complete and are the basis of this policy and are to be considered as incorporated in and constituting part of this policy. No statements contained in the Application or knowledge possessed by any natural person *Insured* shall be imputed to any other natural person *Insured* for the purposes of determining if coverage is available. Knowledge possessed by the person(s) signing the Application shall be imputed to all Companies, plans and other Insured entities, and knowledge possessed by the chief executive officer, chief financial officer and in-house general counsel of any *Company* and the trustees of any plan shall be imputed to such *Company* or *plan*.
>
> The Insurer shall not have the right to rescind in whole or in part COVERAGE SECTION 2 for any reason. However, the Insurer and the Insured expressly agree and acknowledge that the foregoing should not be construed to affect in any way or under any circumstances the Insurer's right to seek rescission of the coverage otherwise provided by any other COVERAGE SECTION.

- 20 -

74.     Part II(D) of the Common Policy Terms ("Common Definitions") provides that
"*Insured* means, with respect to any COVERAGE SECTION, any organization, plan or natural
person covered under such COVERAGE SECTION."

### F. Bond Terms and Conditions

75.     Under the Bond, "The Underwriter, in consideration of an agreed premium and
subject to the Declarations, Insuring Agreements, General Agreements, Conditions and
Limitations and other  terms thereof, agrees to indemnify the Insured for" different kinds of loss.
(Ex. D Insuring Agreements.)

76.     The Bond's "Fidelity" Coverage applies to:

(1) Loss resulting directly from dishonest or fraudulent acts
committed by an *employee* acting alone or in collusion with others.

Such dishonest or fraudulent acts must be committed by the
*employee* with the intent

(a) to cause the Insured to sustain such loss; or

(b) to obtain financial benefit for the *employee* or another person
or entity.

(Ex. D Insuring Agreements (A).)

77.     The Bond's definition of *employee* includes "an officer or other employee of the
Insured, while employed in, at, or by any of the Insured's offices or premises covered
hereunder." (Ex. D Conditions and Limitations, Definitions, Section 1.)

78.     The Bond provides that "Any intentional misrepresentation, omission,
concealment or incorrect statement of a material fact, in the application or otherwise, shall be
grounds for the rescission of this bond." (Ex. D General Agreements, Representation of
Insured.)

## COUNT I (RESCISSION)

79.     F&D incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

80.     Rescission is warranted when the Insured made a false representation; the insured knew the representation was false when it was made or the insured made the representation in bad faith; and the representation was material to the risk being insured.

81.     The Application was submitted to Bernadette Sherrod on May 21, 2010.

82.     As set forth above, by the terms of the Policy, every Defendant represented that "the particulars and statements contained in the Application and any documents or information submitted to the Insurer in connection therewith are true, accurate and complete and are the basis of this policy and are to be considered as incorporated in and constituting part of this policy." (Ex. A at Common Policy Terms Part VII (F).)

83.     The Insured's failure to completely answer Question 5 of the Application was materially misleading since in March 2009 and continuing through September 30, 2010 the Insured was on notice that its accounting methodologies did not comply with the OCC's interpretations of the applicable rules and regulations.

84.     The Insured's representation that Question 6 of the Application was true and correct was materially misleading, since the OCC presented the Bank with a formal cease and desist order on June 29, 2010; the OCC entered a consent order with the Bank on September 1, 2010; no Defendant disclosed either event to F&D or updated the application; and the insurance policy was issued on September 30, 2010.

85.     The Insured's representation that Question 8 of the Application was true and correct was materially misleading because, among other things:

a. the application did not disclose the resignation of Michael Conahan, who was a director of FNCB and resigned as a result of a federal indictment on January 26, 2009;

b. the application did not disclose the resignation of Michael J. Cestone, Jr., who was a director of FNCB and resigned on June 24, 2009;

c. the application did not disclose the resignation of William Lance, the principal financial officer and principal accounting officer for FNCB, effective February 2010;

d. the application omitted key information about each resignation, including but not limited to the fact that both Lance and Lombardi's resignations occurred just days before both were obligated to certify the accuracy of the company's financial statements and the adequacy of its financial controls;

e. the reason for Lombardi's resignation stated in the application contradicts FNCB's SEC filing of March 1, 2010 stating that a replacement was appointed "following the unexpected resignation of J. David Lombardi, who has stepped down as CEO and Director of the Corporation and the Bank for personal health reasons, effective today."

86.     The Insured's representation that the attachments to the Application pursuant to Question 9 were true and correct was materially misleading because FNCB's 2009 Form 10-K did not properly calculate the Allowance for Loan and Lease Losses (ALLL) and other-than-temporary impairments (OTTI).

87.     Each of the false or misleading statements made in the Application was material to F&D's decision to issue the Policy and Bond with the coverages they contained at the premiums they required.

88.     On information and belief, Defendants were aware of the misleading nature of their representations and omissions and were actively concealing this information from F&D in order to not only obtain insurance coverage but also to obtain enhanced coverage.  This belief is based on the facts set forth above in this Complaint, and includes as well the following facts:

a.  During the period in which key information was being misrepresented or omitted, FNCB was simultaneously using a consultant to aggressively negotiate highly relevant modifications and enhancements to its coverage under the Policy;

b.  Many of the loan and securities-related losses being hidden or minimized by FNCB's improper accounting were the result of self-dealing about which the individual Defendants were aware, as set forth at length in the underlying action;

c.  FNCB had received repeated notice from the OCC and SEC about the questionable nature of its accounting methodologies;

d.  OCC performed onsite investigations about which the Insured would have been aware;

e.  Given the nature and importance of the investigations, both the OCC and SEC investigation were likely discussed at meeting of the Board of Directors; and

f.  Each Defendant was aware of the resignation of each member of the Board of Directors and senior management.

89.     FNCB's representation that the answer to Question 2 of Section 1.B was true and correct was materially misleading because, as explained above FNCB did know of facts and

circumstances that might give rise to claims under the Fidelity coverage of the Bond, based on, among other things, FNCB's awareness of the self-dealing loans and material misstatements in its financial reporting.

90.     Plaintiff is therefore entitled to rescission of the Bond and Policy.


## COUNT II (DECLARATORY JUDGMENT)

91.     F&D incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

92.     Based on the foregoing, the Insured were aware of the likelihood of the claims that were ultimately brought in the Gray Litigation and threatened securities suit before the Policy was delivered or issued.

93.     Under the doctrine of known loss, losses of which the Insured were aware or should have been aware were likely to occur are excluded from coverage under the Policy as a matter of public policy.  Under each of the above coverage sections, the definition of *loss* excludes "matters which are uninsurable under the law pursuant to which this policy shall be construed." (Ex. A at Coverage Section 1 Part III(H)(3); Coverage Section 3 Part II(H)(3); Coverage Section 6 Part II(G)(3).)

94.     Part of the damages sought in the Gray Litigation are for disgorgement of the individual Defendants' ill-gotten gains and any judgment or settlement of the Gray Litigation would constitute, in whole or part, restitutionary relief.

95.     Restitutionary damages are explicitly excluded under the Policy and as a matter of public policy.  (Ex. A at Coverage Section 1 Part IV(A)(3); Coverage Section 3 Part III(C); Coverage Section 6 Part IV(C).)

96.     If the allegations of the Gray Complaint are proven in the course of the litigation (or any other adjudicative process), then there will be a binding adjudication proving intentional misconduct on the part of Defendants that would result in exclusion of the resulting loss.   (*See* Ex. A at Coverage Section 1 Part IV(A)(8); Coverage Section 3 Part III(H); Coverage Section 6 Part IV(H).)

97.     Therefore, in the event that the Court does not declare the Policy to be void, by reason of the aforesaid, F&D is entitled to a judicial declaration that the Policy does not cover Defendants' $10,000,000 claim for indemnity.

98.     An actual controversy exists between F&D and Defendants and this Court has the power to declare the rights and obligations of the parties pursuant to 28 U.S.C. § 2201.

**WHEREFORE** F&D asks this Court to:

A. Declare the Policy and Bond void;

B. Or, in the alternative, determine, decide adjudicate and declare the rights and liabilities of the parties hereto with respect to the Policy;

C. Determine, decide adjudicate and declare that there is no duty to indemnify Defendants under the Policy based on the grounds set forth in this Complaint and any other grounds pursuant to F&D's declination and reservation of rights;

D. Award F&D all costs and expenses incurred in the matter, and grant any such other and further relief which this Court deems just and proper.

Date: September 5, 2012

/s/ Ronald P. Schiller
Ronald P. Schiller (PA 41357)
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, Pennsylvania 19103
Telephone (215) 568-6200
Facsimile (215) 568-0300
rschiller@hangley.com